NORTHROP et al. v. MERCANTILE TRUST & DEPOSIT CO. OF BALTIMORE.

(Circuit Court of Appeals, Fourth Circuit.   November 6, 1907.)

No. 635.

CONTRACTS—RIGHT TO RECOVER COMPENSATION—FAILURE TO PERFORM.

Plaintiffs and defendant entered into a written contract by which defendant agreed to make certain payments to plaintiffs for their services rendered and to be rendered in promoting a plan for the buying by defendant of the stock and bonds of a water company, its reorganization, and the procuring of a contract with a city for furnishing water from a new source of supply, plaintiffs agreeing to co-operate with defendant in every way in their power "to facilitate and promote the successful termination of this enterprise." The project then contemplated failed, because the investigation of the proposed water supply proved unsatisfactory, and the matter was dropped, but was subsequently again taken up by defendant with other parties and carried through, the water being obtained from a different source of supply. To this second enterprise plaintiffs rendered no assistance, but, on the contrary, they attempted to defeat it. *Held* that, if the contract remained in force and applied to the new enterprise, such action of plaintiffs was a breach on their part which debarred them from any right to recover thereon.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 1279, 1280, 1424–1429.]

In Error to the Circuit Court of the United States for the District of South Carolina, at Charleston.

J. P. K. Bryan and Randolph Barton, Jr., for plaintiffs in error.

Francis K. Carey (W. C. Miller and Philip H. Gadsden, on the brief), for defendant in error.

Before PRITCHARD, Circuit Judge, and MORRIS and DAYTON, District Judges.

MORRIS, District Judge. This writ of error brings to this court for review the rulings in a suit instituted June 30, 1902, by Northrop and Tucker against the Mercantile Trust & Deposit Company of Baltimore to recover the sum of $65,000, alleged to be due on a written contract between the plaintiffs and defendant, dated September 26, 1901. For some years prior to 1901 it was quite well and widely known that the city of Charleston was without adequate water supply. The city being between two rivers, which were really estuaries of the sea and salt, the lands surrounding the city being low and swampy, attention had been directed to finding some source of supply not impregnated by salt water or the impurities of the swamps. The existing water supply of the city was derived from artesian wells within the city limits, owned by the Charleston Waterworks Company, but the supply was inadequate in quantity and unsuitable in quality for some important uses. In this situation the plaintiff Tucker interested himself in a scheme which he believed would solve the problem. There were three sources which were being considered as possibly satisfactory for obtaining the needed supply without too great expense. There were subterranean springs, on a tract known as the "Ten-Mile Tract," on which there were two locations which were considered promising,

·one called "Yeaman Hall" and one called the "Williams Tract." The third source was Goose Creek, a stream which by many was thought to be so unfit that even by filtration its water could not be made suitable. The plaintiff Tucker had satisfied himself that the Yeaman Hall tract was the very best location for the purpose, and had secured an option for its purchase. The city of Charleston was unable to provide the necessary money to construct the required plants, for the reason that her bonded debt already had reached the limit prescribed by the state Constitution. In this situation of affairs the Charleston Light & Water Company was incorporated, and, after much discussion and examination, a contract was about to be executed between the city of Charleston and the Charleston Light & Water Company by which the light and water company was to undertake to build and equip, according to plans prepared by the American Pipe Manufacturing Company of Philadelphia, a complete system of waterworks by which the supply was to be taken from Goose Creek, at a point about 16 miles from the city, the water to be purified by filtration, and when so filtered to be properly distributed in the city, and with the provision that the light and water company were to purchase the existing plant of the old waterworks company. This proposed contract provided that the city of Charleston should pay, for 50 years, $42,000 a year to the light and water company. Certain citizens, who were taxpayers in Charleston, ·entered suit in the Supreme Court of South Carolina to test the power ·of the city to bind itself by the proposed contract, and this suit was promoted by both the plaintiffs in this suit, Mr. Tucker and Mr. Northrop. It was contended by the plaintiffs in the suit that the contract to pay $42,000 a year for 50 years was an increase of the debt of the ·city and forbidden by the Constitution; that certain of the members of the city council were disqualified to vote on this contract; and also that the water of Goose Creek was unfit for the proposed use, and could not be rendered fit by filtration, or by any process or treatment. Upon the ground that by the proposed contract the city of Charleston would create a debt beyond the limit imposed by the state Constitution, unless sanctioned by a vote of the freehold voters of Charleston, which vote had not been obtained, the Supreme Court of South Carolina enjoined the city from executing the contract. In consequence of this adverse decision, the proposed contract was abandoned. The plaintiff Tucker thereupon prepared a prospectus of a plan which he favored for obtaining a water supply, which he communicated to the officers of the defendant trust company. This scheme was based on obtaining the supply of water from artesian wells, to be located on the Yeaman Hall part of the Ten-Mile Hill tract, a body of land about 1,400 acres, some 10 miles from Charleston, on which the plaintiff had obtained an option to purchase. This prospectus set forth that the parties making the proposal would undertake, for $500,000, to obtain all the stock and bonds of the old company, and would guarantee to obtain from the city a contract, approved by a vote of the voters of the city, which would bind the city to pay the new company $42,000 a year for the use of 550 hydrants and an additional amount for each additional hydrant. The prospectus was accompanied by certificates of engineers, who pronounced the water obtainable from the Ten-Mile tract by wells and

springs suitable for the purposes intended, ample in quantity, and requiring no filtration. The plaintiff Tucker visited Baltimore in July, 1901, and urged the defendant trust company to co-operate with them in investigating and testing this underground water supply on the land controlled by the plaintiffs, known as the "Yeaman Hall Tract," near Ten-Mile Hill. The result of the interviews between the plaintiff Tucker and the defendant trust company are stated in the following letter, written by Mr. Post, its third vice president, dated August 7, 1901:

"August 7, 1901.

"R. P. Tucker, Esq.

"Dear Sir: Referring to our conversation in regard to the Charleston Water Works Company, we now beg to confirm our understanding as follows:

"You are to obtain for us an option on the entire capital stock, aggregating $200,000, all of the first mortgage bonds, aggregating $200,000; all of the second mortgage bonds, aggregating $300,000, of the said company, for the aggregate cash sum as agreed upon between us. You are to obtain this option within fifteen days from the date of this letter, and the option is to run for ninety days from the date on which we receive it, in a duly executed form. The stock and bonds in question are to be deposited with a copy of the option and subject to its terms in some responsible banking institution in Charleston.

"Upon the receipt of the option duly executed, we are to immediately take steps to inform ourselves as to the existence of a supply of first class water, to the amount of not less than 4,000,000 gallons per day, at or near the city of Charleston, and we agree to spend not less than $2,500 for making this investigation prior to the expiration of the said option; and if, as the result of this investigation we have become satisfied that we have discovered and investigated a water supply which is sufficient in quantity and satisfactory in quality, and is, in our opinion, in all respects adequate for the needs of the city of Charleston, and if the legal situation is satisfactory to our company, we will buy the above mentioned stock and bonds at the price named, provided that an examination of the physical and financial condition of the books, accounts and property of the Charleston Water Works Company show that the facts set out in the typewritten prospectus presented by you to our company, which has been initialed by yourself and Mr. Post under date of this letter, are substantially correct.

"It is understood that at the time of the giving of the option the company has no outstanding obligations other than the above mentioned capital stock and bonds and current accounts payable in the ordinary operation of the company, and that pending the running of the option no payments shall be made by the company other than those necessary for the ordinary operating expenses of the company.

"Pending the running of said option, you are to give us the benefit of your best endeavors without compensation, to secure for us the ground selected by our engineer for the purpose of the above mentioned tests, and in case we decide to take up said option, you are to co-operate with us to procure such legislation as we may think necessary or desirable.

"Pending the running of said option, you are to procure for us full access to the books, papers and accounts of said company, and such opportunity as we may desire for examination of its plant.

"Yours very truly,                              A. H. S. Post,
                                          "Third Vice-President."

To this letter Mr. Tucker replied as follows:

"Baltimore, Md., August 7th, 1901.

"To the Mercantile Trust and Deposit Company of Baltimore.

"Gentlemen: I beg to acknowledge the receipt of your letter of this date, relating to the Charleston Water Works Company, which is satisfactory to

me. I will proceed at once to use my best effort to procure the option referred to in your letter, and hereby confirm the agreement between us as evidenced by that letter.

"Yours very truly,                                        R. P. Tucker."

The understanding between the parties and the compensation to be derived by the plaintiffs is further explained by a letter from the plaintiff Tucker, dated August 8, 1901, and the reply of the trust company thereto, which were as follows:

"Baltimore, August 8th, 1901.

"Mr. A. H. S. Post, Third Vice President, Mercantile Trust and Deposit Company, City.

"Dear Sir: While our discussion of your letter of the 7th instant assures me that our construction of it is the same, still there are one or two points that had best be brought out more clearly.

"First. In the event of the Mercantile Trust and Deposit Company, purchasing the securities of the Charleston Water Works, viz.: $200,000 of stock, $200,000 of first mortgage bonds, and $300,000 of second mortgage bonds— it is expressly stipulated and agreed that the said Mercantile Trust and Deposit Company shall pay for the hereinbefore mentioned securities of the Charleston Water Works, the sum of $425,000 this amount to be paid as follows: The bank holding the aforesaid securities and options shall be paid the amount of these options and the difference 'between the amount of said options and $425,000 is to be paid me at the same time.

"Second. It is agreed that as compensation for my services to your company, I am to receive 0/20th (sic) of the entire new stock issue of the Charleston Water Works, or any company organized to take its place—the total amount of the issue of said stock not to exceed $1,000,000. You have informed me that you desire to obtain an option on land selected by your engineers before any steps are taken towards getting options on securities. I take it that the time consumed in getting this option shall be allowed beyond the date given as the limit for getting security options.

"Yours very truly,                                        R. P. Tucker."

"R. P. Tucker, Esq.

"Dear Sir: I beg to acknowledge receipt of your favor of even date, and confirm your understanding of our agreement as to the conditional purchase of the Charleston Water Works Company, as contained in your letter.

"We further agree that the fifteen days given to you to secure said option is to count from the date you have secured the option on the ground selected by our engineer for the necessary test.

"Yours very truly,                                        A. H. S. Post,
                                                          "Third Vice-President."

On August 14, 1901, the plaintiff Tucker wrote Mr. Carey, counsel for the trust company, the following letter:

"Baltimore, August 14, 1901.

"Mr. F. K. Carey, City.

"Dear Sir: I regret very much your absence just at this time, for the attitude the Mercantile Co. has taken will most assuredly lose them the game. I returned to Charleston, as you know, accompanied by Mr. Quick, for the purpose of acquiring the land desired, and if possible an option on the securities of the company. I ascertained that the land could be procured at a reasonable price, but that it was impossible to obtain an option on the company's securities. Of course there are some members of this company that would give options, but unless the whole can be secured it is useless to secure any. After some consultation, we decided first to approach Mr. Cunningham, president—he is the largest holder, and the hardest man to handle. We realized that if he could be gotten, we could get all the others, but if not, it would then be useless to proceed any further. Mr. Cunningham was approached through the very best and the most influential channel, and his answer was that under no consideration would he give an option on his

holdings. My opinion is that this debars our getting options on the entire holdings, and that any further attempt would only raise the cost price. I learned on my return to Charleston, that the American Pipe Company had made the same attempt, with like results; they realize that they hold the key to the situation, and the more inquiry and the more attempt that is made to obtain that key without putting up the absolute cash will certainly raise the cost price. I returned to Baltimore yesterday and laid all this before the Mercantile people; in addition to this I understand that Mr. Quick after his second examination has stated to them that he is absolutely certain the water can be procured, and will stake his reputation on that statement. In view of the aforenamed facts, I can not understand the position taken by the Mercantile people; they now claim that it will be impossible for them to take any farther steps, until the return of their president. If they had stated this at first, it would have saved me the four weeks that I have been dangling at the end of their line, and in which I may have done something. Their first statement was that if their engineer reported water, there, they would immediately take the matter up. Of course, as they have notified me that they must drop the matter until the return of their president in October, I will take it up with the other parties. I can be reached through Charleston at any time.

"Yours very truly,                                        R. P. Tucker."

On the report, and by the advice of the engineer employed by the defendant trust company, the Yeaman Hall tract, on which the plaintiff Tucker had an option, was abandoned as too far removed from facilities of transportation, and he recommended a more accessible tract known as the "Williams Tract," in the Ten-Mile region from which he believed good water could be obtained from, artesian wells. It was with that tract in mind that the parties exchanged the foregoing letters of August 7 and 8, 1901, and entered into the agreement therein contained. The plaintiffs having, as stated in the aforegoing letter of Mr. Tucker of August 14, 1901, failed to obtain an option on the bonds and stock of the old waterworks company, the mayor of Charleston, together with the board of commissioners, solicited Mr. Israel, the vice president of the old company, to assist in a solution of the difficulty, and he approached the defendant trust company and offered to give to it an option to buy the bonds and stock of the old company at $350,-000. Thereupon the defendant trust company entered into the agreement with the plaintiffs contained in the following letters:

"Baltimore, September 24, 1901.

"Messrs. R. D. Fisher & Sons, Representing Messrs. Northrop & Tucker, Charleston, S. C., Baltimore, Md.

"Gentlemen: In accordance with our verbal understanding, I have now to make you a proposition in regard to compensation to be alloted to you in the event we exercise options to purchase the Charleston Water Works Company.

"The situation as advised to you, is simply this. We expect within the next few days to secure a ninety days option on the Charleston Water Works Company. Should we be successful in obtaining the option, it is our purpose to develop on the grounds selected by our engineer, Mr. Quick, and with the location of which you are familiar, the possibilities in the way of an artesian well water supply.

"If these tests and our investigations prove satisfactory to us, we expect to acquire said Water Works Company, and to reorganize its present capitalization.

"We have carefully weighed in our minds the value of the services that you have rendered, and in the event that we exercise our option to purchase, we offer you $5,000 cash and 1/20th of the capital stock of the new company,

said capital not to exceed $1,000,000. On your part we expect you to co-operate with our engineer, and secure the necessary ground for the purposes above indicated, and in every way in your power to facilitate and promote the successful termination of this enterprise.

"I am leaving to-night for my vacation, and have to request therefore that you will consider this proposition and confirm same to our second vice-president, Mr. Spence, should it prove satisfactory to you. In the hope that this transaction may work out to our mutual advantage, I remain,

"Yours very truly,                                    A. H. S. Post,
                                                    "3d Vice President."

After some negotiation with regard to the compensation offered to the plaintiffs, the terms were finally agreed upon, in the following letters:

"Baltimore, September 26th, 1901.

"Messrs. C. B. Northrop and R. P. Tucker.

"Dear Sirs: Referring to our Mr. Post's letter of September 24th, 1901, addressed to Messrs. R. D. Fisher & Sons, representing yourselves, we beg now to modify the terms of said letter as follows:

"In the event of our exercising our option to purchase the Charleston Water Works Company, we will pay you $10,000 in cash, instead of $5,000 as mentioned by Mr. Post, and will give you in addition to the 1/20th of the capital stock of the present company or any new company which may be formed, $5,000 par value of said stock; said cash payment to be made to you at the time of payment for the securities of the Charleston Water Works Company.

"*In consideration of said payment, you agree to co-operate with our engineer and to secure the necessary ground for our purposes, and in every other way in your power to facilitate and promote the successful termination of this enterprise, and to aid us in procuring any legislation that we may desire.*

"Kindly confirm this letter.

"Yours very truly,                                    C. R. Spence,
                                                    "2nd Vice President."

"Baltimore, Md., Sept. 26, 1901.

"Charles R. Spence, Esq., 2nd Vice President, Mercantile Trust and Deposit Company, Baltimore, Md.

"Dear Sir: We have your favor of this date in regard to the Charleston Water Works Company matter, but same makes reference to and is based upon an option held by you upon the securities of that company of which we have no official knowledge.

"As we understand your letter, in the event of the purchase or re-organization by you of the present Charleston Water Works Company as a result of the recent and pending investigations by you, and of the negotiations which have been had between us during the past summer, you are to pay us ten thousand dollars ($10,000) in cash, five per cent. (5%) of the capital stock of the proposed new company, or of the present company re-organized, and an additional five thousand dollars, ($5,000) par value of said stock; the cash is to be paid to us at the time you pay for the securities or property of the present Charleston Water Works Company, and the stock certificates to be delivered to us as soon as issued. With this understanding, we accept your proposition and will thank you to return the enclosed duplicate hereof, after having marked same correct.

"Yours very truly,          [Signed]          Claudian B. Northrop,
                                                    "R. P. Tucker.

"Correct with the understanding that the within mentioned payment is in full compensation for all services heretofore rendered, and to be rendered by you. Further with the distinct understanding that at this date we have no actual option on the Charleston Water Works Company, but simply strong assurances that such option will be given by the 1st of October.

"[Signed]                                    C. R. Spence, 2nd V. P."

The investigations of the engineers employed by the defendant trust company were continued during October, November, and December, 1901, with the result that these experts finally reported that the quantity of water obtainable by the proposed artesian wells would be insufficient, and thereupon the defendant trust company wrote the following letter to the plaintiffs:

"January 17, 1902.

"Messrs. C. B. Northrop and R. P. Tucker, Charleston, S. C.

"Dear Sirs: We beg to advise that our engineers, Messrs. Hill, Quick and Allen have to-day advised us that the available water on the property controlled by you gentlemen is insufficient to justify any further expenditure of money for development purposes and consequently, with regret, as we have expended a very large amount of money—$4,000 in fact, in this quarter, we have determined to abandon this proposition, and you are consequently free to take this matter up in any other quarter you may desire, as we consider that the agreement made between us is now at an end.

"We will to-day advise the owners of the Charleston Water Works Company that we will not avail our option, which expires on the 20th instant, to take over their property, inasmuch as our investigations have not been of a satisfactory nature.

"Yours very truly,                                   A. H. S. Post,
                                                 "Third Vice President."

Whereupon the plaintiffs treated the negotiations as at an end, and endeavored to interest other capitalists in the artesian-well scheme of obtaining water from the Yeaman Hall tract on which they had an option, and the defendant trust company gave the matter up.

On February 25, 1902, the mayor of Charleston addressed a communication to the city council of Charleston, in which he again urged upon their attention the necessity of providing additional water supply for the city. He adverted to the fact that the defendant trust company had ascertained by their experts that water in sufficient quantities could not be obtained from underground sources, and that it had retired from the enterprise. The mayor urged that it had been demonstrated by these investigations that water would have to be obtained from one of the creeks or rivers of the adjacent country. This letter brought about a meeting of the special committee of the council on water and light, and the committee requested the attendance of Mr. Israel, the vice president of the old company, and as the result of these conferences, with which neither the plaintiffs nor defendant had anything to do, Mr. Israel, together with Mr. Williams, a stockholder in the old company, and Mr. Gadsden, a citizen of Charleston, and one of the attorneys who had been representing the defendant, made a visit to the defendant trust company in Baltimore and to the American Pipe Company in Philadelphia. The American Pipe Company had been behind the contract which had been declared invalid by the Supreme Court of South Carolina by which water was to be brought from Goose Creek, and they still strongly believed in that scheme, and these interviews finally led to an understanding that the defendant trust company and the American Pipe Company should together take up with the committee of the city council a plan for supplying the city with filtered water from Goose Creek. Necessary legislation was obtained for an exclusive franchise, and a vote of the voters of Charleston was had approving of the contract, and a syndicate company of the defend-

ant trust company, the American Pipe Company, and others agreed to furnish the money. In this syndicate the American Pipe Company agreed to take the larger share of the bonds. It will thus be seen that the plan finally adopted, and upon which the works were actually constructed, was the plan which the plaintiffs had always consistently and vigorously opposed. Moreover, it was one which required the outlay of more than double the capital which was estimated under the plaintiffs' artesian-well plan, and necessarily resulted in correspondingly less profit to the promoters. This suit is based upon the letter of the defendant trust company, dated September 26, 1901, in which the modified statement of compensation to the plaintiffs is expressly followed by this clause, which in the letter we have had italicized:

"In consideration of the said payment. you agree to co-operate with our engineer and to secure the necessary ground for our purposes, and in every other way in your power to facilitate and promote the successful termination of this enterprise, and to aid us in procuring any legislation that we may desire."

This letter contained the proposition of payment to be made and service to be rendered which was formally accepted by the plaintiffs by their letter of reply. The plaintiffs had succeeded in defeating the original Goose Creek plan, and they so thoroughly believed that suitable water could be obtained only from artesian wells and from the Yeaman Hall tract that they had secured an option on it, and that was in reality the plan which they brought to the attention of the defendant. Their plan was declared by the defendant's experts not practicable. So that part of the proposition failed. They also failed to secure an option on the bonds and stock of the old waterworks company. The only ground for compensation which they could pretend to urge would be that they had, in performance of their agreement, in every way in their power facilitated and promoted the successful termination of the enterprise, and had aided the defendant in procuring any legislation that it desired. That they did not render this service does not rest upon parol testimony, but is demonstrated by their own letter. This is a letter addressed by Mr. Tucker, with the concurrence of Mr. Northrop, to Mr. R. Lancaster Williams, a banker, dated May 27, 1902. The letter informs Mr. Williams that the defendant trust company had obtained the charter of the Charleston Light & Water Company, and had put in a proposition based on Goose Creek as a source of supply, and proceeds to state:

"The Charleston Light and Water Company is the company whose contract with the city based on Goose Creek as a source of supply, we smashed in the Supreme Court a year ago. * * * This proposition has passed the city council, and is to go before the qualified electors of the city, on June 17th."

Then, after stating that the Goose Creek water was looked upon with great disfavor by nearly every citizen of Charleston, and many would never consent to use it for household purposes, he proceeds:

"We feel perfectly certain—as certain as a man can be when judging of a mass of people—that if a proposition were put before the people based on Ten Mile Hill as a source of supply, the present proposition would not be considered for an instant. Our desire is to obtain the support of people

who are financially responsible, and able to carry out a deal of this magnitude in case of success. With this support, we could put in a counter proposition, based on the Ten Mile source, and, as I have said before, we feel perfectly certain of our ability to obtain a contract."

After stating estimated figures of cost and revenue, he concludes:

"There is a clear profit in this deal of at least one million dollars, as I have aforesaid, at an expenditure of $830,000. With the city bound for 30 years, I can not find a flaw in this as a first class and absolutely substantial business proposition, and I sincerely hope that you will see your way clear to giving us the desired support."

The testimony of Mr. Douglas H. Gordon, president of the International Trust Company, was to the effect that Mr. Tucker, three weeks before the vote of the Charleston electors was to be taken, urged the same matter on his attention, and urged the International Trust Company to join in a proposition to bring water from Ten-Mile Hill, in order to defeat the proposed contract about to be voted on to bring it from Goose Creek.

It seems to us that this conduct of the plaintiffs is conclusive against their right to recover, and that this is so obvious that the simple statement of it needs no amplification. The compensation agreed upon was for services to be rendered by the plaintiffs. The services were not rendered, and instead of facilitating and promoting the successful termination of the enterprise, as they had agreed to do, they exerted themselves to defeat it. The execution of a binding contract, such as would give value to the securities to be issued by the new company to finance the undertaking, required the action of the Legislature, the agreement of the city council, and the sanction of a popular vote of the citizens of Charleston; so that the stipulation in the agreement for the plaintiffs' compensation that the plaintiffs would promote the success of the enterprise and would aid in procuring any desired legislation was not an immaterial stipulation, but one of very vital importance. As it turned out, this was the only matter in which the plaintiffs could have been of service to the defendant and its associates, and the fact that the plaintiffs worked against the adoption of the defendant's plan is not only destructive of their right to recover, but is very significant of their own understanding of the situation. For if the plaintiffs had not considered that all connection with the defendant had ended when the artesian-well plan was given up and the Goose Creek plan adopted, it is not to be believed they would have actively antagonized the defendant's enterprise. As long as they considered the defendant bound under the contract to pay them for their services and assistance, the strictest good faith was required of them. It is only fair to infer that their present claim for compensation was an afterthought, due to their disappointment in not defeating the Goose Creek plan. We have set forth with fullness this aspect of the case, as it was the defense pleaded by the defendant in its answer, and we are of opinion that it renders unnecessary any minute consideration of the rulings of the court which were excepted to by the plaintiffs and which are assigned as error.

The court instructed the jury that the defendant was liable under its contract with the plaintiffs, if they should find from the evidence

that the defendant was led to adopt the Goose Creek source of supply as the result of the investigations which it agreed to make and which were spoken of in the plaintiffs' letter of September 26, 1901, "as a result of the recent and pending investigations by you, and of the negotiations which have been had between us during the past summer." The court also left it to the jury to determine whether, in making the investigations which resulted in its rejecting the Ten-Mile region as a source of supply, the defendant acted in good faith, and acted in good faith in allowing their option on the old water company to expire in January, 1902, and not with the purpose of taking up the Goose Creek source of supply, and for the purpose of getting rid of any obligations they were under to the plaintiffs and then renewing negotiations with others to obtain the privileges they needed; and the court instructed the jury that, if the defendant in these matters acted in bad faith, then it was guilty of fraud and the plaintiffs were entitled to recover the full amount claimed, but that if, after a bona fide investigation of the plan proposed by the plaintiffs, the defendant found it impracticable and abandoned the enterprise, and was afterwards approached by Messrs. Israel and Williams, and was induced as the result of conferences with them and with the American Pipe Company to take up a different scheme of development, based on Goose Creek as a source of supply, requiring a more costly plant, then the plaintiffs were not entitled to recover. Under these instructions, the jury found for the defendants. We think the court's instructions were more favorable to the plaintiffs than the testimony entitled them to, and that the court would have been justified in directing a verdict for the defendant on the ground already adverted to in this opinion, and therefore the matters assigned as errors are, in that view of the case, immaterial.

Affirmed.